**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OMOWALE CASSELLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 C 7712 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| BILL JACKSON, JAMI PAINTER, and | ) | |
| ANNABELLE CLARKE, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

After Plaintiff Omowale Casselle, an African American, lost his position as the director

of the Pritzker Tech Talent Labs of the University of Illinois System's Discovery Partner's

Institute ("DPI"), he filed this lawsuit against Defendants the Board of Trustees of the University

of Illinois (the "Board"), Bill Jackson, Jami Painter, and Annabelle Clarke.  In his first amended

complaint, he alleges that the Board engaged in race discrimination, harassment, and retaliation

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

He also brings claims for race discrimination, harassment, and retaliation against all Defendants

in violation of § 1983.  Defendants have moved to dismiss the § 1983 claims, as well as the Title

VII harassment claims, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Because sovereign

immunity bars Casselle's § 1983 claims and he has not sufficiently alleged his Title VII

harassment claims, the Court dismisses these claims without prejudice.

**BACKGROUND**[1]

Casselle, an African American, served as the inaugural director of the Pritzker Tech Talent Labs within DPI. He began this role in December 2020. DPI is part of the University of Illinois System (the "System"). It conducts tech workforce development, applied research, and business in Chicago. The Pritzker Foundation funded the DPI program with a $10 million grant, with the intent to create opportunities within the technology field for 7,000 participants annually by 2029 and to draw forty percent of those participants from underrepresented populations. Jackson served as DPI's executive director, Painter worked as the director of human resources for the System, and Clarke worked as a director of administration for the System.

Casselle did not receive any negative evaluations during his employment and instead received merit pay increases in 2021 and 2022. Beginning in November 2022, he began to complain about what he perceived as race discrimination in the workplace. Specifically, he sent several emails complaining about differences in the hiring, promotion, and management of White and Black people and offering suggestions on how to mitigate the racially hostile environment at DPI. He also advocated for participants in DPI's apprenticeship program. For example, Casselle learned that DPI leadership did not allow apprentices, who generally came from underrepresented populations, to use DPI's kitchen or refrigerators on the fourth floor of the building and instead required apprentices to use facilities on the twentieth floor, allegedly because apprentices "might steal food." Doc. 9 ¶ 22. Casselle complained to leadership that other employees and students could use DPI's kitchen and break rooms on the fourth floor. Casselle also learned that Jackson and another employee worried that apprentices would steal laptops provided by the school and so discussed creating a policy to address the issue, even

---

[1] The Court takes the facts in the background section from the first amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

though no evidence suggested that apprentices had actually stolen any laptops. Casselle complained that Jackson's assumptions and stereotypes implied "underlying criminality." *Id.* ¶ 26. On another occasion, after Casselle heard a White employee accuse a Black apprentice of smoking weed, Casselle asked the White employee why he made the comment, with the White employee responding that while he had no evidence that the Black apprentice smoked weed, he seemed "slow and wasn't learning the material as fast as others." *Id.* ¶ 28. During a team dinner, Jackson asked for recommendations for scaling the DPI program, with one of Casselle's co-workers suggesting imposing more rigorous admissions standards. Jennifer Foil, DPI's director of workforce development, responded that this would mean accepting less Black people into the program. Casselle complained that Foil expressed a racist viewpoint.

Casselle complained to Jackson, Painter, and Clarke about these instances of racism, indicating they should not be tolerated. During one meeting with Jackson and Clarke, Casselle told them that he "believe[d] DPI is a racially discriminatory environment that treats persons of color differently." *Id.* ¶ 41. Clarke and Painter routinely disciplined Black employees, placing them on performance improvement plans without cause and applying policies and procedures differently to Black and non-Black employees. Casselle specifically elaborated that a Black woman did not receive a promotion because of racial stereotypes, but a White woman and a White man avoided placements on performance improvement plans despite supervisors documenting performance issues. Jackson, Painter, and Clarke ignored Casselle's complaints, and the System's leadership did not make any changes or discipline those who made the discriminatory remarks. Jackson even verbally attacked Casselle, prompting Casselle to take time off due to emotional distress.

After Casselle complained about the discrimination, Jackson issued Casselle a sixty-day letter of expectation, even though such letters typically had ninety-day timeframes. The System's policy also requires two years of performance reviews before placing an employee on a performance improvement plan, but Casselle did not have any reviews before receiving the letter of expectation. When Casselle asked Jackson about the deviation from policy, he stated that he "wanted to shock the system." Doc. 9 ¶ 55. Defendants also rescinded invites for meetings that involved Casselle's job tasks and excluded him from key personnel decisions related to his responsibilities.

Casselle's contract renewal date was August 15, 2023. On July 25, 2023, Casselle verbally learned that DPI did not plan to reappoint him to his position. He complained about being treated differently due to his race and having engaged in protected activity, and he also filed a grievance. On August 7, 2023, Casselle received an email reiterating that DPI would not reappoint him to his position. Although Casselle initially was told he had six months before his contract ended, Painter reduced the six-month period to two months after Casselle complained about discrimination. And immediately thereafter, Jackson told the head of DPI's IT department to terminate Casselle's access to the building and delete his files, even though he had two more months to work. DPI replaced Casselle with an Indian male who had not engaged in legally protected activity.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's

favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.      Sovereign Immunity

Defendants argue that they enjoy Eleventh Amendment immunity from Casselle's § 1983 claims. The Eleventh Amendment bars suits brought against a state in federal court. *Pennhurst State Sch. & Hosp. v. Holderman*, 465 U.S. 89, 98 (1984). Sovereign immunity does not apply where the state consents to suit or federal legislation abrogates the immunity pursuant to a constitutional grant of authority. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). The Court first considers whether the Eleventh Amendment bars Casselle's claims against the Board and then turns to its effect on his individual capacity claims against Jackson, Painter, and Clarke.

#### A.      Section 1983 Claims against the Board

Casselle does not seriously challenge Defendants' argument that he cannot pursue his § 1983 claims against the Board. Indeed, "[s]tate universities, as well as their governing bodies, are protected from suit under the Eleventh Amendment." *Mutter v. Madigan*, 17 F. Supp. 3d 752, 757–58 (N.D. Ill. 2014) (citing *Kaimowitz v. Bd. of Trs.*, 951 F.2d 765, 767 (7th Cir. 1991)), *aff'd as modified sub nom. Mutter v. Rodriguez*, 700 F. App'x 528 (7th Cir. 2017). Therefore, the Court dismisses Casselle's § 1983 claims (Counts IV, V, and VI) against the Board. The

dismissal is without prejudice, given that Eleventh Amendment immunity goes to the Court's

jurisdiction. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 533–34 & n.2 (7th Cir. 2022).

**B.      Section 1983 Claims against Jackson, Painter, and Clarke**

Next, Defendants argue that despite Casselle indicating that he pursues his claims against

Jackson, Painter, and Clarke in their individual capacities, they are actually official capacity

claims and so also barred by the Eleventh Amendment.  As the Supreme Court has explained,

individual capacity suits "seek to impose personal liability upon a government official for actions

he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Official-

capacity suits, in contrast, 'generally represent only another way of pleading an action against an

entity of which an officer is an agent.'" *Id.* (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S.

658, 690 n.55 (1978)).  "Whereas in an official capacity suit the plaintiff alleges that the

defendant was party to the execution or implementation of official policy or conduct by a

government because the real party in interest is the entity, an individual capacity suit focuses on

the constitutional torts of an individual official." *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th

Cir. 1991).  Here, Casselle challenges Jackson's, Painter's, and Clarke's individual conduct in

allegedly discriminating and retaliating against him, not just the execution or implementation of

the System's policies, and so the Court does not find it appropriate to recharacterize Casselle's

claims against them as official capacity claims.

That does not end the inquiry, however, because Defendants alternatively argue that,

even treated as individual capacity claims, sovereign immunity bars the claims because Casselle

seeks the same damages against Jackson, Painter, and Clarke that he does against the Board.

While the Eleventh Amendment does not typically bar a claim against state officials in their

individual capacities, a plaintiff cannot seek "monetary relief from state employees in their

*individual* capacities *if* the suit 'demonstrably has the identical effect as a suit against the state.'" *Haynes v. Ind. Univ.*, 902 F.3d 724, 732 (7th Cir. 2018) (quoting *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001)).  In other words, sovereign immunity bars even individual capacity suits where "the money will flow from the state treasury to the plaintiffs." *Luder*, 253 F.3d at 1024.[2]

The Seventh Circuit has twice found that sovereign immunity bars claims against state university officials sued in their individual capacities related to employment matters.  *See Haynes*, 902 F.3d at 731–32 (sovereign immunity barred § 1981 race discrimination claim against university administrators); *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) (sovereign immunity barred due process and academic freedom claims brought under § 1983 by a terminated former professor against university officials).  These cases teach that "sovereign immunity bars a state-employed plaintiff from bringing individual-capacity claims against state-employed supervisors or coworkers who deprived him of rights, benefits, or opportunities arising from his employment relationship with the state." *Melgaard v. Wis. Dep't of Nat. Res.*, No. 24-CV-561, 2025 WL 3268370, at *4 (W.D. Wis. Nov. 24, 2025).  Because plaintiffs "seek to recover the value of their state employment" in such cases, they are "effectively against the state." *Id.*

Casselle's claims against Jackson, Painter, and Clarke for race discrimination, harassment, and retaliation arising out of his employment at DPI appear to meet the parameters set forth in *Omosegbon* and *Haynes* for sovereign immunity to apply.  But Casselle argues that

---

[2] The fact that the State would pay any damages assessed against Jackson, Painter, and Clarke pursuant to the State Employee Indemnification Act, 5 Ill. Comp. Stat. 350/2, has no relevance to the inquiry and so the Court does not address it further.  *See Luder*, 253 F.3d at 1023 ("The fact that the state chooses to indemnify its employees who are sued in federal court is irrelevant, because it is the voluntary choice of the state, not a cost forced on it by the federal-court suit. . . . Indirect effects are not enough; otherwise the practical necessity for a state to compensate an employee for bearing liability risks would place individual-capacity suits under the bar of the Eleventh Amendment." (citations omitted)).

the Court should find that his claims can proceed because he does not only seek lost wages and benefits, which flow from his employment contract, but also requests compensatory damages from Jackson, Painter and Clarke, including recovery for embarrassment, personal humiliation, loss of reputation, and mental anguish and suffering.

Indeed, some courts have allowed claims to proceed where plaintiffs seek compensatory and punitive damages from individual state employees. *See, e.g.*, *Sizyuk v. Purdue Univ.*, No. 4:20-CV-75, 2024 WL 68282, at *3–4 (N.D. Ind. Jan. 5, 2024) (allowing claims where the plaintiff sought compensatory and punitive damages from individual state employee, not lost wages or lost benefits); *Calautti v. Shanahan*, No. 118CV00119, 2019 WL 3717980, at *6 (S.D. Ind. Aug. 7, 2019) (allowing complaint to proceed against individual state employees where the plaintiff sought compensatory and punitive damages from the individual employees in addition to lost wages and other financial losses); *Reinebold v. Ind. Univ. at S. Bend*, No. 3:18-CV-525, 2019 WL 1897288, at *3 (N.D. Ind. Apr. 25, 2019) ("'Compensatory damages' as a concept includes recovery for embarrassment, personal humiliation, impairment of reputation, mental anguish and suffering, etc. Even where a plaintiff seeks compensatory damages associated with an employment contract, courts have declined to dismiss on sovereign immunity grounds where the plaintiff also seeks to recover for these less tangible items." (citation omitted)). Other courts, however, have reasoned that the type of relief sought does not matter and that the inquiry should remain focused on the substance of the plaintiff's claims. *See Smith v. Ill. Dep't of Corr.*, No. 24-CV-5022, 2025 WL 744098, at *4 (N.D. Ill. Mar. 7, 2025) ("Nor does the Court believe that the way a plaintiff pleads damages should be decisive as to whether a case is truly against the state rather than individual defendants. To hold otherwise would allow plaintiffs to defeat a sovereign immunity argument just by throwing in an allegation of emotional pain and

suffering."); *Melgaard*, 2025 WL 3268370, at *5 (rejecting the plaintiff's argument that his case differed from *Omosegbon* and *Haynes* because he did not seek back pay but instead "compensatory damages for lost income, injury to his personal reputation, mental and emotional distress, as well as punitive damages"); *Upchurch v. Indiana*, No. 1:23-CV-01310, 2025 WL 2336851, at *5 (S.D. Ind. Aug. 12, 2025) (concluding that the plaintiff's request for compensatory and punitive damages did not "obscure the fact" that he based his claims against individual state employees on the denial of employment opportunities he would have received from the state if not for the alleged discrimination); *see also Gerlach v. Rokita*, 95 F.4th 493, 501 (7th Cir. 2024) ("Even if the sought after compensation would not definitively be paid out of the state treasury, if the amount the plaintiff seeks 'should have been paid by the State,' the suit is likely one against the state itself." (citation omitted)).  The Court agrees with the latter line of cases that the focus should be whether a plaintiff's claims against the individual state employees "stem[ ] from the plaintiff's state employment contract, not on whether the plaintiff[ ] s[eeks] damages other than lost wages and benefits."  *Hoffman v. Bd. of Regents*, No. 23-CV-853, 2025 WL 1504376, at *5 (W.D. Wis. May 27, 2025).

Here, because Casselle's claims all arise from his contention that Jackson, Painter, and Clarke denied him opportunities that he would have received from the System absent racial discrimination, harassment, and retaliation, his individual capacity claims arise from his employment relationship.  As such, sovereign immunity bars Casselle's claims against Jackson, Painter, and Clarke in their individual capacities.  *See Smith*, 2025 WL 744098, at *3 (sovereign immunity barred claims against individual state employees alleging "constitutional violations premised on [the plaintiff's] employment relationship with the state"); *Hoffman*, 2025 WL 1504376, at *5 (finding plaintiff's hostile work environment, discrimination, and retaliation

claims against individual state employees barred by sovereign immunity). The Court therefore dismisses Casselle's claims against Jackson, Painter, and Clarke (Counts II, IV, V, VI, VIII, IX) without prejudice.

## II. Title VII Harassment Claims

Finally, Defendants argue that Casselle has not pleaded an actionable Title VII racial or retaliatory harassment claim. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). To state a harassment claim, a plaintiff must allege that (1) he was subject to unwelcome harassment, (2) the harassment was based on his protected characteristic, (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment, and (4) a basis exists for employer liability. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015). Defendants argue that Casselle has not pleaded severe or pervasive harassment.

For purposes of a harassment claim, the "harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). This includes both subjective and objective components. *Harris*, 510 U.S. at 21. To determine whether a workplace is objectively hostile, the Court considers "the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

10

performance.'" *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (quoting *Harris*, 510 U.S. at 23).

While Casselle may have subjectively found the conduct at DPI so severe as to create a hostile or abusive working environment, without more specificity, his allegations do not allow the inference that a reasonable person would find his work environment hostile, nor do they suggest how the harassment unreasonably interfered with his work performance. *See, e.g.*, *Boniface v. Westminster Place*, No. 18-CV-4596, 2019 WL 479995, at *3 (N.D. Ill. Feb. 7, 2019) (dismissing the plaintiff's claim because her allegations were vague and the complaint contained "no specific allegations suggesting that any conduct was physically threatening or verbally abusive or how it interfered with her work performance"); *Stone v. Bd. of Trs.*, 38 F. Supp. 3d 935, 945 (N.D. Ill. 2016) (dismissing the plaintiff's claim because "there is no factual allegation which would plausibly suggest either the severity or pervasiveness of the identified harassment"). While he does complain that toward the end of his employment, Defendants excluded him from meetings and personnel decisions, he does not tie this to Defendants' evaluation of his work performance. And to the extent Casselle alleges that Jackson or others directed verbal attacks at him when he complained about alleged racial incidents, he does not include any specifics about the contents of these verbal attacks that would suggest the extent of their harassing nature or whether tied to a protected characteristic. *See Cole v. Bd. of Trs.*, 838 F.3d 888, 896 (7th Cir. 2016) ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.'" (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014))).

11

Casselle's main allegations of harassment involve the alleged harassment of others, not harassment directed toward him. For example, he claims that apprentices could not use the kitchen or refrigerators on the fourth floor and instead had to use the twentieth floor, that Jackson remarked that apprentices would steal laptops, that a Black woman did not receive a promotion, and that he stood up for a Black man accused of smoking weed. He also complains that Clarke and Painter routinely disciplined Black employees and did not treat Black and non-Black employees the same. The fact that Casselle was not the target of this alleged harassment lessens its impact. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("While certainly relevant to the determination of a hostile work environment claim, when harassment is 'directed at someone other than the plaintiff, the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.'" (alteration in original) (citation omitted) (internal quotation marks omitted)).

Ultimately, Cassell's allegations are too thin to suggest severe or pervasive harassment. *See McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-06500, 2014 WL 4269126, at \*7 (N.D. Ill. Aug. 28, 2014) ("Plaintiff's allegations in the Amended Complaint, while no doubt describing rude and unpleasant conduct, by themselves do not seem to rise to the level of the hostile and abusive atmosphere found in the case law." (collecting cases)); *Triplett v. Starbucks Coffee*, No. 10 C 5215, 2011 WL 3165576, at \*5–7 (N.D. Ill. July 26, 2011) (dismissing hostile work environment claim despite allegations of a racially insensitive comment, racially based disciplinary actions, and discrimination against African American employees on multiple occasions). Therefore, without more, Casselle cannot proceed with his harassment claims at this time, and the Court dismisses these claims without prejudice.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss [10]. The Court dismisses Casselle's § 1983 claims (Counts II, IV, V, VI, VIII, and IX) and his Title VII harassment claims (Counts III and VII) without prejudice. Casselle's Title VII race discrimination and retaliatory discharge claims (Counts I and X) against the Board remain pending.


Dated: March 19, 2026

_____
SARA L. ELLIS
United States District Judge